No. 25-70010

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

JUAN RAUL NAVARRO RAMIREZ,
*Petitioner-Appellant*,

vs.

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,
*Respondent-Appellee*.

**On Appeal from the United States District Court for the Southern District of Texas, McAllen Division, No. 7:18-CV-00386**

# PETITIONER-APPELLANT'S APPLICATION FOR A CERTIFICATE OF APPEALABILITY ("COA") AND BRIEF IN SUPPORT

JON M. SANDS
FEDERAL PUBLIC DEFENDER
District of Arizona

JENNIFER Y. GARCIA (AZ NO. 021782)
*Counsel of Record*
SONIA L. FLEURY (CA NO. 298534)
ASSISTANT FEDERAL PUBLIC DEFENDERS
250 North 7th Avenue, Suite 600
Phoenix, Arizona 85007
(602) 382-2816 voice
(602) 382-2800 facsimile
Jennifer_Garcia@fd.org
Sonia_Fleury@fd.org

*Counsel for Petitioner-Appellant Juan Raul Navarro Ramirez*

# CERTIFICATE OF INTERESTED PERSONS

*Juan Raul Navarro Ramirez*, No. 25-70010

*Petitioner-Appellant*,

v.

*Eric Guererro*,

*Respondent-Appellee*.

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case.

1. **Petitioner-Appellant:**

   Juan Raul Navarro Ramirez

2. **Counsel for Petitioner-Appellant:**

   Jennifer Y. Garcia & Sonia L. Fleury, Assistant Federal Public Defenders, Federal Public Defender's Office for the District of Arizona

3. **Respondent-Appellee:**

   Eric Guerrero, Director of the Texas Department of Criminal Justice, Correctional Institutions Division

4. **Counsel for Respondent-Appellee:**

   Katie D. Abell, Assistant Attorney General, Office of the Texas Attorney General, Criminal Appeals Division

Jon M. Sands
Federal Public Defender
Jennifer Y. Garcia
Sonia Fleury

*/s/ Jennifer Y. Garcia*
Attorney for Petitioner-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner-Appellant Juan Raul Navarro Ramirez respectfully requests that this Court grant his Application for a Certificate of Appealability ("COA") and consider his appeal from the district court's denial of his federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Oral argument in this matter will assist the Court in deciding both the procedural status and the merits of whether Ramirez was denied the effective assistance of counsel at sentencing due to his trial counsel's failure to understand and apply the rules of evidence. Due to this failure, counsel was unable to secure the admission of compelling and relevant evidence in mitigation. In addition, oral argument will assist the Court in deciding Ramirez's second claim that the statements he made during his interrogation were involuntary and should have been suppressed by the trial court.

# TABLE OF CONTENTS

Statement Regarding Oral Argument ........ ii
Table of Authorities ........ v
Application for Certificate of Appealability ........ 1
Statement of Jurisdiction ........ 2
Statement of Issues Presented for Review ........ 2
Standard of Review ........ 3
Statement of the Case ........ 5
Summary of the Argument ........ 10
Argument ........ 12

I. Reasonable jurists could debate the district court's resolution of Ramirez's Claim 1 regarding the ineffective assistance of his sentencing counsel. ........ 12

A. Reasonable jurists could disagree with the district court's finding that Ramirez did not meet his burden under *Martinez* and *Trevino* to prove that his state habeas counsel was ineffective for failing to raise this substantial claim of trial counsel ineffectiveness. ........ 13

B. Reasonable jurists could debate whether Ramirez's underlying claim is substantial, making *de novo* review of the merits appropriate. ........ 18

1. Ramirez's trial counsel performed deficiently when her ignorance of evidentiary rules prevented admission of compelling mitigation evidence at sentencing. ........ 20

a. Juvenile Records ........ 22

b. Expert testimony ........ 25

2. Ramirez was prejudiced by counsel's failure to put evidence from the unadmitted records before the sentencing jury. ........ 30

II. Reasonable jurists could disagree with the district court's order denying Ramirez's Claim 4H regarding the voluntariness of his statements to police officers. ........ 40

A. Reasonable jurists could find that this claim is unexhausted but that any default is overcome by the *Schlup* actual innocence gateway. 40

1. Pretrial interrogations 43

2. The Suppression Hearing 48

3. New Evidence 51

Conclusion 56

Certificate of Compliance 57

Certificate of Service 58

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Andrus v. Texas*,
590 U.S. 806 (2020) ....................20, 31

*Arnold v. Dittmann*,
901 F.3d 830 (7th Cir. 2018). Case ....................54

*Buck v. Davis*,
580 U.S. 100 (2017) ....................4, 19, 40

*Busby v. Dretke*,
359 F.3d 708 (5th Cir. 2004) ....................13

*Coleman v. Hardy*,
628 F.3d 314 (7th Cir. 2010) ....................54

*Connor v. Quarterman*,
477 F.3d 287 (5th Cir. 2007) ....................40, 41

*Hinton v. Alabama*,
571 U.S. 263 (2014) ....................15, 18, 21

*House v. Bell*,
547 U.S. 518 (2006) ....................41

*Majoy v. Roe*,
296 F.3d 770 (9th Cir. 2002) ....................54

*Martinez v. Ryan*,
566 U.S. 1 (2012) ....................13, 14, 31

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ....................3, 4

*Pippin v. Dretke*,
434 F.3d 782 (5th Cir. 2005) ....................4

*Porter v. McCollum*,
558 U.S. 30 (2009) ....................20, 39

*Rompilla v. Beard*,
545 U.S. 374 (2005)....................22

*Scheanette v. Quarterman*,
482 F.3d 815 (5th Cir. 2007)....................4

*Schlup v. Delo*,
513 U.S. 298 (1995).................... 11, 40, 41, 42, 43, 54, 55

*Shinn v. Ramirez*,
596 U.S. 366 (2022)....................13, 14

*Skinner v. Quarterman*,
528 F.3d 336 (5th Cir. 2008)....................3, 55, 56

*Slack v. McDaniel*,
529 U.S. 473 (2000)....................3, 13

*Strickland v. Washington*,
466 U.S. 668 (1984)....................15, 20, 21, 31

*Teleguz v. Pearson*,
689 F.3d 322 (4th Cir. 2012)....................54

*Trevino v. Thaler*,
569 U.S. 413 (2013)....................13

*Vasquez v. Hillery*,
474 U.S. 254 (1986)....................41

*Wiggins v. Smith*,
539 U.S. 510 (2003)....................20

*Williams v. Taylor*,
529 U.S. 362 (2000)....................20, 21, 30, 40

**State Cases**

*Ex parte (Humberto) Garza*,
620 S.W.3d 801 (Tex. Crim. App. 2021)....................19, 20, 22, 30

*In re D.W.H.*,
No. 08-99-00187-CV, 2000 WL 1643511 (Tex. Crim. App. Nov. 2, 2000) ........ 29

*Ex parte Garza*,
620 S.W.3d at 822–24 ........ 22, 30, 39

*Ramirez v. State*,
No. AP-7167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007) ........ 6, 8

*Ex parte Ramirez*,
No. WR-71,401-01 & WR-71,401-02, 2015 WL 6282336 (Tex. Crim. App. Oct. 14, 2015) ........ 9

*Simmons v. State*,
564 S.W.2d 769 (Tex. Crim. App. 1978) ........ 29

*Ex parte Smith*,
No. WR-73,266-01, 2010 WL 975230 (Tex. Crim. App. Mar. 17, 2010) ........ 54

**Federal Statutes**

28 U.S.C. § 636 ........ 18

28 U.S.C. § 1291 ........ 2

28 U.S.C. § 2253 ........ 2

28 U.S.C. § 2253(c)(1) ........ 3

28 U.S.C. § 2254 ........ 3, 40

**Rules**

Texas Rule of Evidence 705(d) ........ 18

Texas Rule of Evidence 803(6) ........ 18, 29

Texas Rule of Evidence 902 ........ 23

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

Petitioner-Appellant Juan Raul Navarro Ramirez respectfully moves the Court for a certificate of appealability ("COA") on two issues raised in his federal petition for writ of habeas corpus and denied by the district court below.

Ramirez was convicted for his role in a crime committed by a group of men in 2003, when he was just eighteen years old. No physical evidence linked Ramirez to the crime and the primary evidence against him was a coerced confession obtained after his repeated requests for counsel were denied, and prior to being read his *Miranda* rights. Even taken as true, his inculpatory statement at most places him at the scene of the crime, playing a minor role. Ramirez never confessed to killing anyone.

His death sentence was the result of trial counsel's ignorance of key evidentiary rules, which meant the jury never heard compelling evidence of his extremely traumatic and abusive childhood. Every adult who was ever responsible for Ramirez failed him, as did the system tasked with ensuring he got the help he so desperately needed but never did. Compelling evidence of his specific vulnerabilities—caused by childhood abuse and neglect, brain damage and learning disabilities, and mental health issues that resulted in perpetual feelings of worthlessness and multiple suicide attempts—would have been especially mitigating. Indeed, one of Ramirez's co-defendants—who unlike Ramirez was a

leader and organizer of the crime—obtained penalty-phase relief in his habeas proceedings based in large part on substantially similar evidence his trial counsel likewise failed to present. In light of Ramirez's minor role in the crime (detailed in the coerced confession used to secure his conviction), it is reasonably probable that at least one juror would have struck a different balance and voted to spare his life. Instead, the jury never heard or considered this crucial evidence, and trial counsel's failures condemned him to death.

## STATEMENT OF JURISDICTION

Ramirez was sentenced to death by the 370th District Court of Hildago County, Texas. On July 15, 2021, Ramirez filed an amended petition for writ of habeas corpus. (ROA.1014.) The district court denied Ramirez's petition and declined to issue a COA on any of his claims on October 15, 2024 (ROA.3704) and denied his motion for reconsideration on May 2, 2025 (ROA.3890). The court entered final judgment on May 2, 2025. (ROA.3894.) He filed a timely notice of appeal on May 30, 2025. (ROA.3900.) This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Ramirez respectfully requests that the Court issue a COA as to the two claims below and allow the case to proceed to briefing and argument on the merits.

> **Claim 1**: Trial counsel's failure to present and explain all readily available mitigating evidence was constitutionally deficient and prejudicial to the outcome of Ramirez's sentencing proceeding.
>
> **Claim 4(H)**: Ramirez's Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court failed to suppress Ramirez's involuntary statements derived from his police interrogation.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act requires federal habeas petitioners to obtain a COA before an appeal may be heard. 28 U.S.C. § 2253(c)(1). To qualify for a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." *Id*. § 2253(c)(2). The appellate courts may not consider any claims raised in which a COA has not been granted. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). When the district court dismisses a claim on procedural grounds, a COA should issue if the petitioner shows "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court "conduct[s] only a 'threshold inquiry'" at this stage. *Skinner v. Quarterman*, 528 F.3d 336, 340-41 (5th Cir. 2008) (quoting *Miller-El*, 537 U.S. at 336, 338). The standard for obtaining a COA is not the same as the one for deciding the merits of a claim:

> The COA inquiry, we have emphasized, is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.

*Buck v. Davis*, 580 U.S. 100, 115 (2017) (quoting *Miller-El*, 537 U.S. at 327).

Accordingly, a petitioner need not establish at this stage that he is entitled to relief. The COA standard "would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Miller-El*, 537 U.S. at 337. A claim may be "debatable," and therefore require a COA, even "though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338.

The standard for issuing a COA is intended to screen out only clearly frivolous claims. And, in a death penalty case, any doubt as to whether the petitioner has advanced a non-frivolous claim "must be resolved in [petitioner's] favor." *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007) (citation omitted); *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## STATEMENT OF THE CASE

*Ramirez's Arrest and Interrogation*

On January 5, 2003, the police were called to 2915 Monte Cristo Road in Edinburg, Texas. (ROA.9614.) They searched both houses located on the property and discovered six deceased victims with fatal gunshot wounds. The victims were alleged members of the Chicano Brotherhood gang and the investigation came to focus on alleged members of a rival gang, the Tri-City Bombers ("TCB"). At the time of his arrest a few weeks later, Ramirez was under the influence of Rohypnol. (ROA.9614–ROA.9615, ROA.8063, ROA.8073.) At the police station, Ramirez was booked and questioned repeatedly regarding the crime despite. He was not advised of his *Miranda* rights until after he had already made incriminating statements. (ROA.8064–ROA.8068.)

*Trial: Guilt Phase*

At trial, the State did not present any physical evidence linking Ramirez to the crime. The State prosecuted Ramirez on the theory that he committed the actions that his codefendant Marcial Bocanegra attributed to a person he called "Lenny" and whom Ramirez described in his purported confession. (*See, e.g.*, ROA.3418.)

The State opened its case-in-chief by calling multiple law enforcement officers who investigated the case. (ROA.9415–ROA.9602.) Detective Ramiro Ruiz described the investigation and played the audiotape of Ramirez's statement.

(ROA.9550.)

Rosie Gutierrez—a surviving witness and mother of one of the victims, Jerry Hidalgo—testified that several masked men entered her home, and one of them gave orders, tied up her son, and hit him with a frying pan. (ROA.9622, ROA.9625–ROA.9627, ROA.9633.) The assailants then left but a similarly dressed man returned moments later and shot Hidalgo. (ROA.9627–ROA.9628.) The state concluded its case with testimony generally linking unknown gang members to the crime. *Ramirez*, 2007 WL 4375936, at *1–4.

Ramirez's principal defense at trial consisted of re-calling and attacking Ms. Gutierrez regarding a romantic relationship and eliciting questions about her ownership of the property where the crime occurred. (ROA.9965.) The defense also re-called Officer Ramiro Ruiz. (ROA.9960.) He testified that the police had received information that Ramirez went by the nickname "Lenny." The defense called four more witnesses who were either related to the victims or had recently been at the property where the offense occurred (ROA.9967–ROA.9973; ROA.9995–ROA.10007), and re-called Officers Edgar Ruiz and Robert Alvarez, neither of whom provided any information helpful to the defense. (ROA.10009–ROA.10013.)

On December 15, 2004, the court held closing arguments, and the jury returned a guilty verdict on both counts the same day. (ROA.10027–ROA.10038.)

*Trial: Penalty Phase*

The record is clear that defense counsel was aware of her constitutional responsibilities to Ramirez. (ROA.6378–ROA.6384.) "It is going to cost him his life if this case does not get prepared and presented properly." (ROA.7890.) Despite this, defense counsel utterly failed to meet the standards she had previously embraced. The mitigation investigator conducted just three witness interviews (ROA.16141–ROA.16148; ROA.17403–ROA.17405), and the sole mental-health expert never evaluated Ramirez and was poorly prepared to testify. (ROA.15965–ROA.15966; ROA.16150–ROA.16151; ROA.18967.) Most importantly, defense counsel never introduced records from Ramirez's Texas Youth Commission ("TYC") juvenile proceedings which would have provided the jury with compelling and extensive mitigation evidence regarding his mental health and extraordinarily damaging and traumatic childhood.[1] (ROA.10183–ROA.10185.) Because of this failure, the defense expert was prohibited from testifying about the contents of the records, which drastically limited her testimony. (ROA.15789 ¶ 22; ROA.10162.)

---

[1] Ramirez was placed under court supervision and in state custody in 1998 after being adjudicated delinquent for breaking into a vehicle with intent to commit a theft, criminal trespass by entering a property without consent of the owner, and possession of marijuana. (ROA.11397; ROA.11409.) Subsequently, in 2000, the state court adjudicated Ramirez delinquent for two counts of aggravated assault and two counts of deadly conduct. (ROA.11414.) The TYC records contain a plethora of mitigating mental health and other biographical information about Ramirez's devastating childhood that the jury never heard as reasons to spare Ramirez's life.

That same day, the jury returned a verdict of "Yes" to Special Issue One (that Ramirez would be a future danger), "Yes" to Special Issue Two (that Ramirez intended or anticipated that a life would be taken), and "No" to Special Issue Three (that mitigating circumstances warrant a sentence of life imprisonment) for both counts of capital murder. (ROA.10181–ROA.10182.) The trial court sentenced Ramirez to death on both counts of capital murder.

*Direct Appeal*

On December 12, 2007, after oral argument, the CCA affirmed the conviction and sentence as to one of Ramirez's two murder convictions but overturned the second one, finding that it violated double jeopardy–the State had conceded the error. *Ramirez v. State*, No. AP-7167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007) (unpublished).

*State Habeas Proceedings*

Ramirez's first claim in his state habeas proceeding alleged that his trial counsel's performance was objectively unreasonable under prevailing professional norms when they failed to investigate and present mitigation evidence that he suffered from serious emotional distress, severe depression, and post-traumatic stress disorder ("PTSD"), which in turn caused him to self-medicate with inhalants and other drugs beginning at age ten or eleven. (ROA.1196–ROA.1205; ROA.3000–ROA.3040; ROA.15964–ROA.15992.) He supported his claim with the juvenile

records trial counsel failed to have admitted, school records, and declarations from additional mitigation witnesses that had not been interviewed prior to sentencing. (*See, e.g.*, ROA.16294 (Ex. P); ROA.16299 (Ex. Q); ROA.16308 (Ex. R); ROA.16314 (Ex. S); ROA.16319 (Ex. T); ROA.16322 (Ex. U); ROA.16340 (Ex. V); ROA.16342 (Ex. W); *see also* ROA.15951–ROA.15955, ROA.15987–ROA.15988.) He also raised claims alleging intellectual disability, which were later withdrawn when post-conviction counsel inexplicably withdrew all mental-health related claims. Accordingly, the court refused to consider the proffered records and denied Ramirez's claim. (ROA.15503–ROA.15505; ROA.15787.) The CCA affirmed the trial court's denial of the petition. *Ex parte Ramirez*, No. WR-71,401-01 & WR-71,401-02, 2015 WL 6282336, at *1 (Tex. Crim. App. Oct. 14, 2015).

*Federal Habeas Proceedings*

Ramirez filed a federal habeas petition and a motion to stay the proceedings in 2018 (ROA.84), and an amended petition in 2021 after the stay was lifted (ROA.1014). Respondent filed a motion for summary judgment and an answer to the petition (ROA.2452), and Ramirez opposed Respondent's motion for summary judgment, filed a cross-motion for summary judgment, and replied to Respondent's answer (ROA.2955). The magistrate judge filed his report and recommendations (ROA.3304), and both parties filed objections (ROA.3489; ROA.3508). The district court entered an order adopting the magistrate judge's report and recommendations

and denying Ramirez's petition. (ROA.3704.) Respondent filed a motion for reconsideration and Ramirez filed a cross-motion for reconsideration (ROA.3709; ROA.3723), and the district court denied both motions and entered final judgment. (ROA.3890; ROA.3894.) Ramirez filed a timely notice of appeal on May 30, 2025. (ROA.3900.)

## SUMMARY OF THE ARGUMENT

In Claim 1, Ramirez argues that reasonable jurists could disagree as to the district court's resolution of his argument that his trial counsel performed deficiently at his capital sentencing. Counsel's ignorance of the evidentiary rules prevented her from presenting substantial and compelling evidence on Ramirez's behalf. Specifically, she failed to move for admission of Ramirez's voluminous Texas Youth Commission records. These records contained crucial evidence regarding Ramirez's life history, including his traumatic and abusive childhood and his mental-health and psychological history. Counsel was also unable to elicit the vast majority of this information through her expert witness because she never moved for admission of the records, even after the judge ruled that any statements from the expert regarding those records were hearsay. Because counsel's ignorance resulted in the jury never hearing the compelling mitigating evidence contained in those records, Ramirez was prejudiced by counsel's failure.

This claim was never raised in Ramirez's state habeas proceedings, and the ineffective assistance of Ramirez's state habeas counsel is cause to overcome the procedural default of this claim in federal court. State habeas counsel confirmed in a declaration that state habeas counsel's failure to raise this claim was not for any strategic reason; like trial counsel, state habeas counsel did not recognize the evidentiary error and failed to include it in the petition.

Reasonable jurists could debate the district court's ruling on this constitutional claim, and this Court should grant a COA.

Reasonable jurists could also debate the district court's procedural ruling as to Claim 2 regarding the erroneous admission of Ramirez's involuntary statements to law enforcement. The district court found this claim exhausted and denied it on the merits, ignoring Ramirez's arguments that new evidence presented in support of this claim fundamentally strengthened it and thus rendered it unexhausted. Ramirez's new evidence consists of an expanded statement by one of his codefendants as to Ramirez's role in the crime and a report from a false confession expert illustrating the numerous ways in which Ramirez was susceptible to making a false confession to law enforcement.

Although this new evidence results in an unexhausted claim, Ramirez can pass through the gateway discussed in *Schlup v. Delo* to argue the merits of his underlying innocence claim. 513 U.S. 298 (1995). The district court's findings with respect to

this claim, which involves a false confession, should be made only following adversarial testing at an evidentiary hearing. Reasonable jurists could debate the district court's procedural ruling on this substantial claim and a COA should be granted.

## ARGUMENT

### I. Reasonable jurists could debate the district court's resolution of Ramirez's Claim 1 regarding the ineffective assistance of his sentencing counsel.

In Claim 1, Ramirez argued that his trial counsel's failure to present and explain all readily available mitigating evidence was constitutionally deficient and prejudicial to the outcome of his sentencing proceeding. Most importantly, his trial counsel was ignorant of the evidentiary rules governing the capital sentencing proceedings. Her attempt to introduce crucial mitigation evidence through a mental-health expert failed due to sustained hearsay objections and she also failed to have the supporting records properly admitted under the business records exception to the hearsay rules. Accordingly, the trial jury never heard any of the compelling information contained in the records and Ramirez was sentenced to death.

The district court adopted the magistrate judge's findings that this claim was unexhausted because it was never raised in state court (ROA.3386–ROA.3387), and that Ramirez had not proven the ineffectiveness of state habeas counsel to overcome the claim's default (ROA.3391–ROA.3392). Contrary to the district court's order,

reasonable jurists could disagree as to the procedural status of this claim and it deserves "encouragement to proceed further." *Slack*, 529 U.S. at 484.

### A. Reasonable jurists could disagree with the district court's finding that Ramirez did not meet his burden under *Martinez* and *Trevino* to prove that his state habeas counsel was ineffective for failing to raise this substantial claim of trial counsel ineffectiveness.

This claim was not raised in Ramirez's state habeas proceedings due to the ineffective assistance of his counsel in those proceedings. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). Because the claim was not presented in the state court, the claim is considered "technically" exhausted and procedurally defaulted. *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022); *Busby v. Dretke*, 359 F.3d 708, 724 (5th Cir. 2004) (same).

The district court adopted the magistrate judge's finding that this claim was unexhausted because it was never raised in state court (ROA.3386–ROA.3387), and the finding that Ramirez had not proven the ineffectiveness of state habeas counsel to overcome the claim's default (ROA.3391–ROA.3392). However, as discussed in Ramirez's objections to the magistrate judge's findings and his cross-motion for reconsideration, the court made that decision without considering the correct facts supporting the claim. Accordingly, a COA is appropriate because reasonable jurists considering Ramirez's argument could disagree with the court below and find that Ramirez's claim is unexhausted, but not procedurally defaulted due to the ineffective

assistance of his state habeas counsel. In addition, the underlying claim is substantial and thus satisfies the strictures of *Martinez*.

As an initial matter, the substance of this claim has evolved through the pendency of Ramirez's federal habeas proceedings. While Claim 1 was initially a broad claim involving numerous aspects of trial counsel's failures at sentencing and dependent on extensive evidence developed during the federal proceedings (*see* ROA.1190–ROA.1264), the Supreme Court's intervening decision in *Shinn v. Ramirez*, 596 U.S. 366 (2022), necessarily changed the focus. When Ramirez briefed this claim, he relied on the cause and prejudice standard outlined in *Martinez v. Ryan*, 566 U.S. 1 (2012). The *Shinn* opinion changed that standard to prohibit the use of evidence outside the state court record to prove the substantiality of the claim. *Shinn*, 596 U.S. at 384-90 (leaving the *Martinez* cause-and-prejudice rule intact but limiting evidence of trial counsel's ineffectiveness to the state court record).

As a result, Claim 1 is no longer focused on trial counsel's failed investigation (although counsel's performance was clearly deficient). The claim is now alleging that trial counsel failed to understand a rule of evidence, which led the trial court to exclude a substantial amount of compelling mitigation evidence. (*See* ROA.3524–ROA.3529, ROA.3536–ROA.3537, ROA.3548–ROA.3557.) Thus, the claim no longer relies on proof of a failed mitigation investigation. Instead, it focuses on trial counsel's "ignorance of a point of law that [was] fundamental to [her] case combined

with [her] failure to perform basic research on that point." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (stating that this situation "is a quintessential example of unreasonable performance" under *Strickland v. Washington*, 466 U.S. 668 (1984)). (*See* ROA.3554–ROA.3556.) What's more, because state habeas counsel failed to exhaust this substantial trial-counsel-ineffectiveness claim, Ramirez has demonstrated that he can overcome any procedural default based exclusively on the state court record. (ROA.3512–ROA.3513, ROA.3548–ROA.3556, ROA.3567, ROA.3572–ROA.3574.)

Although Ramirez presented the factual and legal basis of this claim in his Cross-Motion for Summary Judgment (ROA.3025–ROA.3029), Respondent-Appellee never addressed it and therefore waived any argument that trial counsel was not ineffective when, due to her ignorance of a basic rule of evidence, she caused the trial court to exclude substantial mitigating evidence from the jury's consideration. Nor did the magistrate judge adjudicate this ignorance-of-the-law-based ineffectiveness claim, or whether state habeas counsel should have recognized the evidentiary misstep of trial counsel and exhausted it in the state court proceeding. (ROA.3385–ROA.3408; ROA.3548–ROA.3557.) The lack of reasoned decision-making as to the procedural status or merits of this substantial claim weighs even more heavily in favor of a COA.

As to the performance of state habeas counsel, the magistrate judge focused on the fact that state habeas counsel withdrew all claims bearing on "[t]hose aspects of [Ramirez's] challenge to the adequacy of his attorneys' investigation and presentation of potential mitigating evidence dealing with his mental condition, cognitive disorder, mental retardation, psychological afflictions, or the psychological effects of his use of drugs or alcohol." (ROA.3391 (quoting ROA.15787).) Most importantly, state habeas counsel's withdrawal of the mental health claims could not have included the claim at issue here because state habeas counsel did not raise it. They failed to recognize the crucial evidentiary errors that trial counsel made with respect to the mitigating evidence contained in the TYC records and thus did not argue that trial counsel's ignorance of the law constituted deficient performance that prejudiced Ramirez at trial. Counsel did not make a strategic or reasoned decision not to present this claim—due to their own ignorance, they simply overlooked it. As Brad Levenson, Ramirez's lead counsel in state habeas, explained,

> Inexplicably, [the Office of Capital and Forensic Writs] made the same error as trial counsel—which is to say, that in the state court habeas proceeding, OCW never identified trial counsel's evidentiary blunder, or its consequences: the jury's failure to learn about Mr. Ramirez's troubled history of serious learning disabilities and childhood mental illness—conditions that were either rooted in and or exacerbated by abuse, neglect, and severe childhood trauma—all of which combined to substantially contribute to chronic social dysfunction beginning with

> Mr. Ramirez's self-medicating with drugs and toxic solvents as early as age ten or eleven.

(ROA.3761 (Declaration of Brad D. Levenson).)

Levenson was clear that there was no objectively reasonable basis or strategic consideration for trial counsel's actions or for OCW's failure to identify this substantial and compelling claim, and that trial counsel's ignorance of the law regarding the admissibility of crucial evidence resulted in her failure to "present a vast quantum of significantly mitigating evidence bearing on Mr. Ramirez's mental impairments." (ROA.3761.) And while the magistrate judge found that state habeas counsel strategically withdrew the mental-health related claims to avoid admission of a negative diagnosis by the State's mental-health expert, Levenson makes clear that they could not have withdrawn a claim they were unaware of and did not raise, and that he never anticipated the state using their expert for any reason after the intellectual disability claim was withdrawn. (ROA.3762.)

This evidence shows that the resulting procedural default should be excused—and that at the very least, reasonable jurists could disagree as to whether the district court correctly concluded otherwise. It was state habeas counsel's duty to appreciate trial counsel's actionable negligence, particularly with respect to an evidentiary ruling that severely undermined the case for life. There was express evidence in the state court trial record that the records had been authenticated and were in admissible

form, including a ruling by the trial court to that effect on October 12, 2004. (ROA.7848.) State habeas counsel, acting reasonably and effectively, would have alerted the state court that the exclusion of relevant mitigation evidence on grounds of hearsay, under Texas Rule of Evidence 705(d), was the result of trial counsel's ineffective failure to have the evidence admitted under Rule 803(6). State habeas counsel's failure to do so was objectively unreasonable and ineffective, and it repeated the prejudicial error of trial counsel. *Hinton*, 571 U.S. at 274. The magistrate judge's contrary finding that this claim was procedurally defaulted is debatable by reasonable jurists and a COA is warranted.

### B. Reasonable jurists could debate whether Ramirez's underlying claim is substantial, making *de novo* review of the merits appropriate.

As noted above, neither the magistrate court nor the district court addressed the underlying claim at issue here—that trial counsel's ignorance of the law resulted in the exclusion of extensive and compelling evidence in mitigation. Because Ramirez has already shown that his state habeas counsel was ineffective for failing to recognize and raise this claim, he must only show that the claim itself is substantial to obtain de novo review under 28 U.S.C. § 636.

Significantly, Humberto Garza, one of Ramirez's codefendants in this case who was a "captain and leader" of the TCB and organized the criminal activity in this case, won relief in his state habeas proceedings due to his counsel's failures to

present similar evidence. *Ex parte (Humberto) Garza*, 620 S.W.3d 801, 809-10 (Tex. Crim. App. 2021). The court of appeals granted Garza habeas relief on his claim that his trial counsel conducted a deficient mitigation investigation after reversing the factually unsupported decision of the 370th District Court—the same court that denied relief to Ramirez. *Id*. at 825 & n.13. The decision granting Garza relief discusses extensively the mitigating contents of his TYC records his attorneys ineffectively failed to present to the jury—a record containing similar evidence of psychological and childhood trauma, abuse, and neglect, discussed in greater detail *infra*, as Ramirez's counsel failed to present. As in Ramirez's case, the TYC records that Garza's counsel failed to present to the jury "contain[ed] extensive information about [his] history and psychological problems," *id.* at 813, which bear striking similarities to Ramirez's history and psychological problems. Unlike Ramirez, however, Humberto Garza had a considerable disciplinary history while incarcerated, including "repeated fighting with other inmates, possessing a weapon (a three-and-a-half-inch piece of metal with a two-inch blade), and stabbing another inmate with a handmade weapon." *Id.* at 822. The fact that a codefendant in this same case—who, unlike Ramirez, was a leader and organizer of the crime—received relief on very similar facts illustrates the deficient performance and prejudice from Ramirez's counsel's actions. Reasonable jurists could disagree regarding the resolution of this claim below. *Buck*, 580 U.S. at 115.

**1. Ramirez's trial counsel performed deficiently when her ignorance of evidentiary rules prevented admission of compelling mitigation evidence at sentencing.**

When reviewing a claim of trial counsel ineffectiveness, the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In the context of a capital sentencing proceeding, the Supreme Court has applied *Strickland* to make clear that absent an objectively reasonable basis for not doing so, capital counsel "must conduct sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all the available [mitigating] evidence." *See Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'"); *Andrus v. Texas*, 590 U.S. 806, 812 (2020) (same). And "[w]hen trial counsel does not conduct a complete investigation, his conduct is reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Ex parte Garza*, 620 S.W.3d at 824 (quoting *Wiggins*, 539 U.S. at 533).

In addition, counsel must understand and comply with state law to ensure admissible evidence is proffered and reaches the jury. *See Williams*, 529 U.S. at 395 (trial counsel failed to present "extensive records graphically describing Williams'

nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Hinton*, 571 U.S. at 274 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

While preparing for the capital sentencing, lead defense counsel Alma Garza expressly acknowledged she would be ineffective under *Williams v. Taylor* if she failed to adequately investigate and present mitigating evidence, including evidence of Ramirez's mental health. (ROA.6380; *see also* ROA.6378–ROA.6384; ROA.15973; ECF Nos. 32-35, Ex. S4, 2 CR at 431 (sealed).)[2] Garza advised the trial court what was at stake for Ramirez: "It is going to cost him his life if this case does not get prepared and presented properly." (ROA.7890.)

Garza sought funding for a mitigation specialist, specifically requesting Gilda Bowen. (ROA.6378–ROA.6387; ROA.6378–ROA.6387.) Garza did not inform the court that this would be Bowen's first death penalty case and her first time investigating mitigation. (ROA.6378–ROA.6387; ROA.18824–ROA.18826.) In her motion seeking Bowen's appointment, Garza emphasized the need to collect records,

---

[2] Documents that were sealed by the district court do not appear in the ROA sent to this Court. Accordingly, Ramirez cites to the district court record here but is filing contemporaneously with this brief a motion in this Court to file those same documents under seal here. Each citation to the district court sealed documents contains the notation "(sealed)" as part of the citation.

including obtaining releases for securing confidential records related to Ramirez's social history, his mental and physical health, including alcohol and drug use and any developmental delays, and juvenile and correctional records. (ROA.6378–ROA.6387.) As the court's decision in *Garza* makes clear, such records are essential to an adequate investigation of a defendant's background and often contain red flags pointing to other fertile avenues of investigation. *Ex parte Garza*, 620 S.W.3d at 822–24. Despite Ramirez's attorney's repeated acknowledgement of the importance of collecting and reviewing such records, she failed to have the records admitted and the jury was unable to consider that information. Due to her failure to have the records admitted, the sole mental-health expert counsel retained was also unable to testify about their contents.

**a. Juvenile Records**

Ramirez was under the supervision of TYC from ages fourteen to eighteen. Garza acknowledged on the record that she needed to obtain records regarding Ramirez's mental and physical health, including TYC records. (ROA.6382.) And competent counsel would have anticipated that the State would cull these records for evidence of future dangerousness, and that she also would need them to rebut the State's case. *See Rompilla v. Beard*, 545 U.S. 374, 383–89 (2005) (counsel ineffective for failing to review prior conviction files when State would use those files to support aggravation in a capital proceeding).

On October 8, 2004, well before trial, the State filed a "Notice of Filing Documents with Business Records Affidavit," that contained an averment that: (1) the 832 pages of TYC juvenile records had been authenticated under "Texas Rule of Evidence 902;" (2) the records were "accompanied by business record affidavits;" and (3) the records had been certified as "business records" by the records custodian, "who is employed by the Texas Youth Commission for the purpose of caring for and storing business records." (ROA.6400; ROA.7848.) The notice of the filing of these records avows that "copies of all documents have been delivered to defendant's attorney of record." (ROA.6400.)

Yet, during a pretrial hearing less than two weeks before trial, Garza made a startling admission. She had failed to independently obtain or review the TYC records. (ROA.7548.) Garza complained to the court that five days earlier she had been served with the authentication notice from the State, but she had not reviewed the records. (ROA.7548.) She stated that once she received the documents she would still need to go through them to determine whether any were objectionable. (ROA.7548.)

One week later, Garza again complained to the court: "Judge, I need to get the records as soon as possible because I need to go through all of them." (ROA.7892.) The prosecutor informed the court that Garza already had copies of the TYC records.

(ROA.7894.) Garza did have them: Bowen's billing records reflect she reviewed them at Garza's office weeks earlier. (ROA.16143; ROA.17403.)

The prosecutor and the trial court took Garza to task for not reviewing the TYC records sooner. First the prosecutor pointed out that Garza had known about the records for months. (ROA.7892.) The trial judge reprimanded her:

> There is another thing, these are juvenile records of not just anybody else but your client. You had the same ability to subpoena the records. They are his records. He can go see his records. And the point that I am making is going back to this, Alma: You are saying that you did not, or you do not have access to certain documents. If you have access to the juvenile records and you haven't even looked at or you haven't had a chance to review that . . . *well, then you need to do that*.
>
> (ROA.7892 (emphasis added.))

The authentication of records and their admissibility were discussed at multiple court hearings. The trial court explained to counsel that the juvenile records had been filed with the clerk along with a business records affidavit for the purpose of "authenticating them, filing them, ***making them in admissible form*****[.]**" (ROA.7848 (emphasis added.)) The certification of the juvenile records was mentioned again at a later hearing. (ROA.7891.) Yet, even after being informed that the TYC records were in admissible form, Garza never offered the records in evidence. Instead, inexplicably, she had her expert rely on hearsay without curing that defect by having the records admitted, resulting in the exclusion of the expert's testimony as to Ramirez's neuropsychological development.

### b. Expert testimony

It was not until after the trial started on October 29, 2004, that Garza first requested funding to hire mental health expert Dr. Kate Allen. (ECF Nos. 32–35, Ex. S4, 2 CR at 431 (sealed).) Delay in this part of the investigation is confounding given that Garza's strategy was to make "[Ramirez's] mental health and [childhood] development . . . a significant factor" at the penalty phase, and none of the other witnesses Garza presented testified about that or had anything specific to say about Ramirez or his background. (ECF Nos. 32–35, Ex. S4 at 1, 2 CR at 431 (sealed).)

The defense's first witness, Dwight Stewart, testified as a gang expert. (ROA.10107–ROA.10111.) Stewart knew nothing about Ramirez and offered no testimony about Ramirez. At the outset of his testimony, Garza asked Stewart: "Now, you are not here to render an opinion as to Mr. Ramirez. Is that correct?" – to which he responded: "That's correct." (ROA.10109.) Instead, Stewart merely offered general testimony about reasons *some* people might join a gang such as the need to belong, family tradition, money, status, and protection. (ROA.10108.) Stewart's direct testimony covers eight pages, which includes a discussion of his qualifications and professional background. (ROA.10107–ROA.10109.) Cross-examination covers five additional pages. (ROA.10109–ROA.10111.)

Garza then called Larry Fitzgerald, a retired public information officer with the Texas Department of Criminal Justice. (ROA.10111–ROA.10116.) He also had

nothing to say about Ramirez. Fitzgerald testified about inmate classification, explaining that there are general population and administratively segregated inmates. (ROA.10112.) Inmates who are under a sentence of death, gang members, and other inmates who are considered security threats are placed in segregation. (ROA.10112, ROA.10115.) Fitzgerald conceded, however, that not all inmates convicted of capital murder are labeled as security threats, and therefore, can be put in general population. (ROA.10112.) Fitzgerald testified that while known members of certain gangs are placed in segregation, the TCB gang was not considered a prison gang for classification purposes. (ROA.10112–ROA.10115.) The clear takeaway from Fitzgerald's testimony was damning: a death sentence was the only way the jury could ensure that Ramirez would not be a danger to others.

Next, Garza called Salomon Avila, a pastor at a church in Edinburg and a prison minister. (ROA.10169.) The full extent of Avila's testimony was that he had ministered to Ramirez, had been placed in the same cell as Ramirez, and did not feel threatened. (ROA.10169–ROA.10170.)

Up to this point, the jurors had learned nothing about Ramirez. The final witness was Dr. Allen. During her testimony trial counsel attempted to elicit evidence regarding Ramirez's background and life history, based on the case records and psychological reports in the TYC records. (ROA.10185.) However, when attempting to explain how the documents she reviewed supported her opinions about

Ramirez, Dr. Allen's testimony was met by a string of hearsay objections, and she was not allowed to disclose any information from the TYC records or make specific references to instances of abuse and trauma from Ramirez's life. (ROA.15789 ¶ 22.) When explaining its hearsay ruling, the trial court said, the records "haven't been admitted." (ROA.10162.)

Thus, while Dr. Allen did testify that Ramirez had suffered from attachment disorder, chronic depression, PTSD, and substance dependency (ROA.10154), the diagnoses were made by others described in the TYC records she reviewed because she never examined him. (ROA.10152–ROA.10167.) On cross-examination, Dr. Allen admitted she had no personal knowledge regarding the specifics of Ramirez's background. (ROA.10168.)

When the proceedings concluded, the jury had learned practically nothing about Ramirez's traumatic life history and the mental health crises he suffered as a child.

That same day, the jury returned a verdict of "Yes" to Special Issue One (that Ramirez would be a future danger), "Yes" to Special Issue Two (that Ramirez intended or anticipated that a life would be taken), and "No" to Special Issue Three (that mitigating circumstances warrant a sentence of life imprisonment) for both counts of capital murder. (ROA.10181–ROA.10182.)

Garza presented an offer of proof concerning the evidence she sought to elicit from Dr. Allen, which comprised several hundred pages of TYC records and included information that Dr. Allen could have relayed to the jury. (ROA.10183–ROA.10185; ROA.10185; ROA.12180.) Garza stated that the proffer had "already been submitted by the State through an affidavit." (ROA.10185; ROA.6400.)

The prosecutor had a simple answer to Garza's offer of proof: "Judge, just as far as that goes, the TYC records were never offered into evidence at any point." (ROA.10185.) The prosecutor went on to explain he "filed an affidavit saying the records were filed, and that [he] might introduce them to lay that self-authenticating predicate." He agreed they were part of the state court record, "but they were not offered in evidence in this case." (ROA.10185.) The prosecutor was right. As the trial court said when explaining its hearsay ruling, the records "ha[d]n't been admitted." (ROA.10162.)

As explained above, Garza should have known the records were in admissible form and could have been admitted. The subject of the admissibility of the records came up during pretrial hearings, concluding with the trial court's ruling: *that the juvenile records had been filed with the clerk along with a business records affidavit for the purpose of "authenticating them, filing them, making them in admissible form*[.]" (ROA.7848 (emphasis added).) The trial court was correct in its admissibility ruling.

Under the rules of evidence, the TYC records were admissible under the business records hearsay exception in accordance with Texas Rule of Evidence 803(6). Texas courts admit records under this exception when the documents are accompanied by certification that they were made and kept during regularly conducted business activities at or near the time of the event. *See Simmons v. State*, 564 S.W.2d 769, 770 (Tex. Crim. App. 1978) (permitting the supervisor of a probation department to testify based on department records where counsel laid sufficient predicate to establish that the records were kept in the regular course of business.); *In re D.W.H.*, No. 08-99-00187-CV, 2000 WL 1643511, at *2 (Tex. Crim. App. Nov. 2, 2000) (admitting juvenile records under the business record exception, including psychological evaluations kept in the regular course of business). Here, the State agreed the TYC records were admissible, and the case law supported its concession. *Simmons*, 564 S.W.2d at 770.

Alma Garza told Judge Gonzalez that Dr. Allen should have been able to testify to these matters:

> You know, the State said that it was hearsay, and expert witnesses should be allowed to get into that area because that's how they arrived at their opinion. And we were not allowed to go into those areas, and the jurors were not allowed to hear all that information as to all these things that happened to Juan as he was growing up since he was a child.

(ROA.10183.) Judge Gonzalez pointed out that all this information was still hearsay and that she could have presented testimony from those individuals if they had

relevant information to share with the jury. (ROA.10183.) Obviously, Garza had not done this either. She never recognized her lack of knowledge as to exceptions to the hearsay rules, and as a result she failed to secure the admission of these relevant, admissible records or to present the critical evidence contained in those records to the jury in another way.

Garza's ignorance of the law and proper trial procedure resulted in a classic case of deficient performance. *See Williams*, 529 U.S. at 395 (trial counsel failed to present "extensive records graphically describing Williams' nightmarish childhood"); *id.* at 396 (counsel failed to introduce educational records that showed Williams did not advance beyond the sixth grade); *Ex parte Garza*, 620 S.W.3d at 810-11, 813–15 (summarizing the limited extent of the mitigation presented during the penalty phase and the "extensive information about [Garza's] history and psychological problems" in Garza's juvenile TYC records that the jury never heard).

**2. Ramirez was prejudiced by counsel's failure to put evidence from the unadmitted records before the sentencing jury.**

There is ample evidence in the state court record to illustrate the prejudice to Ramirez because the jury was unable to consider the evidence in his juvenile records. As noted *supra*, in *In re (Humberto) Garza*, Ramirez's codefendant was granted relief on strikingly similar facts, which also weighs heavily in favor of finding that Ramirez is entitled to a COA because reasonable jurists could debate the district court's ruling as to this substantial claim. *See Garza*, 260 S.W.3d at 822-24.

Prejudice is established under *Strickland* if "there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether [the petitioner] deserved the death penalty as opposed to a lesser sentence." *Andrus*, 590 U.S. at 821. In applying this standard, a court must consider '"the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"'—and '"reweig[h] it against the evidence in aggravation."' *Id*. (quoting *Williams*, 529 U.S. at 397–398). The prejudice showing "requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [the petitioner's] 'moral culpability."' *Id.* at 822 (quoting *Wiggins*, 539 U.S. at 537–538.) Ramirez satisfies the "substantiality" showing, meeting the requirements of *Martinez* and simultaneously establishing prejudice sufficient to prove *Strickland*'s prejudice prong on the merits.

Central to Claim 1 is the failure of trial counsel, and later state habeas counsel, to present evidence bearing on Ramirez's psychological history and mental health. The evidence comes principally from juvenile corrections records created by mental health professionals and caseworkers and compiled by TYC. The evidence bearing on the unexhausted claim is summarized below; had the jury heard it, there is a reasonable probability that at least one juror would have struck a different balance.

In March 1998, Ramirez, barely fourteen, was detained while the court considered whether he should be placed in a residential setting. (ROA.6400; ECF No. 33, Ex. S10 at 4 (sealed).)[3] He was referred for a psychological evaluation by Dr. Gary Whitworth. Dr. Whitworth found fourteen-year-old Ramirez to be expressing symptoms of major depression and suicidal ideation. (ROA.16312.) Ramirez told Dr. Whitworth that "[his] greatest mistake [was] not killing [himself] when [he] had the chance" and that "[he] wished [he] could die." (ROA.16311.) Dr. Whitworth was concerned by Ramirez's use of inhalants and other drugs beginning when he was just ten or eleven. (ROA.16310.) Notably, Dr. Whitworth concluded that Ramirez's use of drugs "dull his emotional pain," a form of self-medication that began before adolescence. (ROA.16311.)

Dr. Whitworth also diagnosed Ramirez with a learning disability, a Reading Disorder. He recommended suicide precautions, a residential treatment program, psychiatric and substance abuse treatment, individual and family therapy, and special education because "he appears to have a learning disability." (ROA.16313.) Among those recommendations, family therapy and special education were never provided. On April 8, 1998, the court placed Ramirez on judicial probation until his eighteenth birthday. (ROA.11887; ECF No. 69, Ex. S12 at 97 (sealed).)

---

[3] This report was also filed with the 370th District Court, Hildago County, Case No. J-154-98-G on December 6, 2004.

On April 17, 1998, fourteen-year-old Ramirez was admitted to the Desert Hills facility in College Station, Texas. Ramirez told the staff at Desert Hills that he "wanted to be dead or never born." (ROA.16320.) He admitted to hopelessness and a "sincere feeling that nobody really cared." (ROA.16320.) Even Ramirez's mother wished he had never been born. (ROA.16302.) Ramirez's psychologist at the facility, Michelle Woehr, Ph.D., found that his primary problems included polysubstance abuse and depression, with multiple suicide attempts since the age of ten. Ramirez's serious mental disabilities were not of his own making. Dr. Woehr concluded that family instability, neglect, and emotional abandonment had contributed to Ramirez's dire condition. (*See* ROA.16320–ROA.16321.) She observed that he felt emotionally abandoned. (ROA.16320–ROA.16321.)

The trauma of community violence that Ramirez confronted was well-documented by Dr. Woehr. Ramirez expressed fear for his family, especially his younger brother, and a belief that he may be harmed by someone wanting to hurt Ramirez. He felt it would be "a real possibility that he will be in danger when he goes home." (ROA.16320.) Ramirez told Dr. Woehr he "expect[ed] to be killed within two years of return to home." (ROA.16321.) Some of his friends had already died from violent gang-related murders. (ROA.16302–ROA.16303.)

Regarding academic skills, Dr. Woehr noted that Ramirez required additional help in reading, writing, and spelling. (ROA.16320.) Ramirez shared that he was

always told by others that he was "stupid," and he believed that was true. (ROA.16321.)

Dr. Woehr documented that Ramirez was suffering from major mental illness, Major Depressive Disorder,[4] PTSD,[5] Polysubstance Dependence, and Conduct Disorder (a precursor to an adult diagnosis of antisocial personality disorder). Dr. Woehr also diagnosed a Reading Disorder and recommended that he be assessed for a learning disability. This assessment never occurred, despite Dr. Whitworth's identical recommendation. In her discharge report, signaling the potential for brain injuries, Dr. Woehr reported that Ramirez had a history of head injuries with loss of consciousness. She also said that "Family therapy is recommended and may be *crucial* for this adolescent." (ROA.16321 (emphasis added.)) That crucial therapy was never provided.

On November 30, 1998, the court ordered Ramirez released back to the custody of his mother. (ROA.11889; ECF No. 69, Ex. S12 at 98 (sealed).) When he

---

[4] Major pediatric depressive disorder is a "common, chronic, recurrent, and debilitating disease state, resulting in impairment in educational, occupational, and social functioning." Sandra Mullen, *Major depressive disorder in children and adolescents*, Mental Health Clinician, 8(6), 276, 275–83 (2018). https://pmc.ncbi.nlm.nih.gov/articles/PMC6213890/ (last visited Sept. 28, 2025.)

[5] PTSD is a disabling disorder in children and adolescents. Kaminer, et al., *Post-Traumatic Stress Disorder in Children*, World Psychiatry, 4(2), 122, 124, 121–25 (June 2005), https://pmc.ncbi.nlm.nih.gov/articles/PMC1414752/ (last visited Sept. 28, 2025).

was returned to the community at age fourteen, he feared he might be killed and did not have the resources to overcome on his own his mental illness or the toxic environment inside and outside his home. One day before his sixteenth birthday, Ramirez was transferred back to the Hidalgo County Juvenile Detention Center after being charged with a new offense. (ROA.11890; ECF No. 69, Ex. S12 at 99 (sealed).)

In April 2000, incidental to criminal conduct that had reoccurred, Ramirez was again referred to Dr. Whitworth for a psychological evaluation. (ROA.16300.) As in his 1998 report, in 2000, Dr. Whitworth connected Ramirez's continuing childhood drug use to his attempt to relieve suffering, i.e., to "dull his emotional pain." (ROA.16304.) He recommended that Ramirez be placed in a juvenile correctional facility capable of providing counseling services and suicide precautions. (ROA.16306.) Dr. Whitworth once again diagnosed Ramirez with a learning disability. (ROA.16305.) But he would never receive special education services. Like Dr. Woehr, Dr. Whitworth also diagnosed conduct disorder.

On May 11, 2000, Probation Officer Juan Ramos conducted a supplemental social study of Ramirez's home. Ramos noted that "Ramirez is in dire need of a highly structured environment that can provide safety for him and the community." (ROA.6400; ROA.11890; ECF No. 69, Ex. S12 at 99 (sealed).) The court determined that at home, he "cannot be provided the quality of care and level of support and

supervision that [he] needs to meet the conditions of probation." (ROA.11416; ECF No. 69, Ex. S12 at 32 (sealed).) Accordingly, on May 31, 2000, the sixteen-year-old Ramirez was placed into the custody of TYC for an indeterminate period, or until his twenty-first birthday. (ROA.11419; ECF No. 69, Ex. S12 at 35 (sealed).) Another assessment after Ramirez was placed in TYC custody at age sixteen, found "*severe problems*, *unable to function in multiple areas . . . may be severely impaired in reality testing or in communications.*" (ROA.16325 (emphasis added.)) This assessment echoed what Drs. Woehr and Whitworth had found two years earlier: "Youth has voiced intentions of harming self through self-infliction . . . overall youth believes no one cares (or should care), no one has his problems, and no one understands." (ROA.16328.) The assessment concluded that Ramirez's family system was plagued by chronic poverty and a chaotic home environment, and that Ramirez suffered from social isolation and deficiencies in literacy. The evaluator determined that Ramirez had been a victim of neglect and appeared to have "grown up on his own." (ROA.16336.)

On June 12, 2000, Ramirez entered the Marlin Orientation and Assessment Unit in Marlin, Texas. (ROA.11905; ROA.6400; ECF No. 69, Ex. S12 at 115 (sealed).) Upon admission, he completed both the English and Spanish versions of the Woodcock-Muñoz Language Survey. The results revealed that Ramirez had significant deficits. At age sixteen, he demonstrated "Very Limited English Reading-

Writing ability of a 9-year-old." (ROA.6400; ROA.6052 ¶ 42.) "On the written portion of this measure, he had the proficiency of a [2nd grade] 7-year-old." (ROA.6400; ROA.6052 ¶ 42.) His performance on the Spanish portion of the test was only negligibly better. (ROA.6400; ROA.6052–ROA.6053 ¶ 43.)[6]

Ramirez also underwent a psychological assessment by Associate Clinical Psychologist, Kim Buck, M.S., on July 12, 2000. Ramirez reported that he felt that his mother had neglected him and that he wished he had never been born. (ROA.16295.) He reported mood swings that cycled between feelings of sadness, anger, and confusion. He acknowledged sleep disturbances and unexplained periods when he felt sad, mad, and hopeless, where he would cry. He stated that he had felt this way since he was four years old. Ramirez discussed a history of suicide attempts, reporting that he had played "Russian Roulette." (ROA.16296.) He also admitted to intentional self-abuse. Ms. Buck concluded that Ramirez had experienced "major trauma." (ROA.16297.)

Another evaluator (Gwenn Murry) came to the same conclusion as those therapists who preceded her. She also found a nexus between Ramirez's emotional suffering and his history of trauma: "This client's substance dependence is

[6] As explained *supra*, Ramirez's public-school records show that his learning disabilities were evident in the early elementary grades, such that by fourth grade he had yet to learn to read or write and had significant deficits in oral communication skills. Yet he was never placed in a special education program, as recommended.

compounded by an *unusually high level of emotional pain*. In addition to being related to the substance dependence, the emotional pain may be part of a broad array of factors such as low self-esteem, excessive self-criticalness, suicidal ideation, [and] ***history of trauma***." (ROA.16317 (emphasis added)). Caseworkers also attributed Ramirez's dire state to family instability, neglect, emotional abandonment, and family chaos. (*See* ROA.17373–ROA.17374; ROA.6400; ECF Nos. 32–35, Exs. S8–S11 (sealed).)

After completing the intake evaluations, in August 2000, Ramirez was sent to the Evins Regional Juvenile Center in Edinburg, Texas, for approximately nine months. (ROA.10084.) While at Evins, he was treated by psychiatrist Esteban Gonzalez, M.D. Dr. Gonzales found that Ramirez's "depression appear[ed] to be chronic." (ROA.6400; ECF Nos. 33-35, Ex. S11 at 144, ECF No. 69, Ex. S12 at 913 (sealed).) Dr. Gonzalez prescribed Juan the antidepressant Wellbutrin. (ROA.6400; ECF Nos. 33-35, Ex. S11 at 144, ECF No. 69, Ex. S12 at 913 (sealed).) Ramirez's records from Evins, and from his previous 1998 placement at Desert Hills show that medication and counseling alleviated the symptoms of his mental illness. (ROA.6400; ROA.12698; ROA.6056 ¶ 52; ECF No. 69, Ex. S12 at 883, 913 (sealed).)

The jury was not allowed to consider any of this evidence when deciding Ramirez's sentence. This is not a case in which the new evidence "would barely have

altered the sentencing profile presented to [Ramirez's jury]." *Porter*, 558 U.S. at 41 (internal quotation omitted). And while the crimes underlying Ramirez's death sentence were an immense tragedy, they do not foretell a sentence of death, as the recent reversal of the death sentence of one of Ramirez's co-defendant's shows. *See Ex parte Garza*, 620 S.W.3d at 824–26, citing *Andrus*, 140 S. Ct. at 1887 ("[W]e think that the habeas mitigation evidence would have provided jurors with important context about Applicant's life that trial counsel failed to present and that would have drawn a considerably different picture for the jury of Applicant's childhood and mental health than what it was presented with at trial.").

Ramirez has demonstrated that his new mitigating evidence, all available at the time of his initial sentencing, would have made a difference to at least one juror. His traumatic childhood, his neurocognitive disabilities, and the institutional failures to treat him would have been sufficient to change the outcome of his penalty phase proceedings. Even among caseworkers and psychologists accustomed to treating traumatized children like Ramirez, his "unusually high level of emotional pain" stood out. (ROA.16317.) "The consequence of counsel's failure to" understand fundamental rules regarding the admissibility of mitigation evidence, or "to conduct the requisite diligent investigation into [her] client's troubling background and unique personal circumstances manifested itself during [her] generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life."

*Williams*, 529 U.S. at 415. The evidence in the state-court record provides an ample basis to find this claim substantial and its default prejudicial, and to negate the procedural default ruling by the magistrate judge. As such, reasonable jurists could disagree as to the disposition of this claim and a COA should issue.

## II. Reasonable jurists could disagree with the district court's order denying Ramirez's Claim 4H regarding the voluntariness of his statements to police officers.

Ramirez's federal constitutional rights were violated when the trial court denied Ramirez's motion to suppress the statements he made to law enforcement. The magistrate judge found the claim exhausted but recommended denying the claim after finding that AEDPA precluded relief. (ROA.3433.) Ramirez asked the district court to consider new evidence in support of the claim, which would render the claim unexhausted, but the district court adopted the magistrate judge's report and recommendations and denied the claim. (ROA.3708.) Reasonable jurists could disagree with the resolution of this claim below and it deserves encouragement to proceed further. *See Buck*, 580 U.S. at 115.

### A. Reasonable jurists could find that this claim is unexhausted but that any default is overcome by the *Schlup* actual innocence gateway.

Ramirez raised a version of this claim in state court but has since offered new facts that substantially strengthen his claim and render it unexhausted. *See Connor v. Quarterman*, 477 F.3d 287, 291 (5th Cir. 2007) ("If a petitioner 'presents material

additional evidentiary support to the federal court that was not presented to the state court,' a claim is unexhausted[.]" (quoting *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003)); *id*. at 292 ("[A] claim is not exhausted if the additional evidence in federal court puts the claim in a 'significantly different and stronger' position than in state court." (quoting *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003)); *see also Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). The new evidence Ramirez presented includes a sworn declaration by his codefendant Marcial Bocanegra (ROA.2063), and an expert report explaining why new evidence demonstrates that Ramirez was vulnerable to making a false confession. (ROA.3597.) This additional evidence puts this claim in a significantly stronger position and alters the evidentiary basis enough to constitute a new, unexhausted claim.

Generally, any unexhausted claim raised for the first time in federal court would be procedurally defaulted. However, Ramirez can overcome that barrier here through the actual innocence gateway established in *Schlup v. Delo*, 513 U.S. 298 (1995). When evaluating evidence of innocence, courts must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327). That is because when innocence is at issue, courts are "to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Schlup*,

513 U.S. at 327–28. In short, the Court should consider all evidence that is both relevant and reliable. *See id*.

In *Schlup*, the Supreme Court held that a credible claim of actual innocence could provide a "gateway" through which otherwise defaulted claims of constitutional error could be considered on their merits in a habeas corpus petition. 513 U.S. at 315–27. Passage through the gateway is permitted if the claim of innocence is supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id*. at 324. To make the requisite *Schlup* showing, a petitioner must establish that, given the new evidence, it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327.

Gateway evidence "is not bound by the rules of admissibility that would govern at trial." *Id*. at 327. The court must look at "the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and new evidence "may indeed call into question the credibility of witnesses presented at trial." *Id*. at 330–32. This means that the court must consider all of the evidence as a whole—the new evidence as well as the evidence presented at trial. The Supreme Court has refused to impose a due diligence barrier on new evidence. Instead, the Court has characterized post-trial affidavits as "new evidence," even

though the affidavits' contents were known at trial. *Schlup*, 513 U.S. at 311 n.21, 312 n.25. Here, the new evidence Ramirez presented is sufficiently reliable to satisfy the *Schlup* gateway and allow his claim to be decided on the merits.

**1. Pretrial interrogations**

Bocanegra was the first co-defendant to be arrested. He made a statement inculpating himself and ten other men, including a person he identified as "Lenny." (ROA.19056, ¶ 6; ROA.17556.) The suspects were alleged to be part of the TCB, while the victims were alleged to be members of the Texas Chicano Brotherhood.

Bocanegra described going inside one of two houses with Lenny, who began giving orders. (ROA.17556.) Bocanegra saw Lenny tie up a man, hit him with a frying pan, and ask him about money and drugs. (ROA.17556.) According to Bocanegra, Lenny left and entered the other house and Bocanegra then heard shots fired from within. (ROA.17556.) Detectives showed Bocanegra a photo lineup that included Ramirez's photo. Bocanegra identified other individuals, but not Ramirez or Lenny. (ROA.547.) The State did not provide the photo lineup to Ramirez's counsel.

Weeks after Bocanegra gave his statement, Ramirez was arrested while he was asleep in his aunt's trailer. (ROA.9504; ROA.9564.) In the hours leading up to

his arrest, Ramirez had taken approximately 15 pills of Rohypnol.[7] (ROA.8063, ROA.8073.) An additional five pills were in his wallet. (ROA.8063, ROA.8073.) Police handcuffed Ramirez while he was still lying in bed and walked him barefoot to the police cruiser. (ROA.8000, ROA.8017.)

Ramirez passed out in the patrol car. (ROA.8062.) When they arrived at the station, Ramirez fell back asleep in a holding cell. (ROA.8062.) Sometime later, Detective Ramiro Ruiz asked Ramirez why he was so sleepy and Ramirez told him that it was because he was "Roched up."[8] (ROA.8069.) Ramirez was then booked. (ROA.8063.)

One of the booking officers, Robert Mendiola, fingerprinted Ramirez and took pictures of his tattoos. (ROA.8063.) When Mendiola questioned Ramirez about his gang affiliation, Ramirez reportedly indicated that he was connected to the "Bombita gang."[9] (ROA.9897.) At no time during his booking did anyone advise Ramirez of his rights despite multiple officers making comments and asking him questions

---

[7] Rohypnol is a strong central nervous depressant belonging to the benzodiazepine class of drugs, which produces a produces sedative-hypnotic, anti-anxiety, and muscle relaxant effects and is abused for its euphoric effect or "high." https://www.dea.gov/factsheets/rohypnol.

[8] "Roche pills" are a slang term for the benzodiazepines Rohypnol and Valium, which are tablets commonly manufactured by Hoffmann-La Roche and imprinted with "Roche." *See* https://www.drugs.com/imprints.php?imprint=roche+roche. (last visited Sept. 29, 2025.)

[9] The "Bombita gang" is another name used for the Tri-City Bombers or the "TCBs." (ROA.9927.)

relevant to the alleged offense. Ramiro Ruiz continued telling Ramirez that they needed to talk. (ROA.8064.) When Ramirez said he did not want to talk, Ruiz took him back to the holding cell and he went back to sleep. (ROA.8064.)

Ruiz eventually came back and told Ramirez that he was being taken for questioning. (ROA.8064.) Ruiz took Ramirez back to the booking area where he told officers he wanted to telephone a lawyer. (ROA.8065.) Ramirez stated that he wanted to telephone Charles Banker, an attorney who had previously represented him. (ROA.8065.) He asked Ruiz for a phone book so that he could look up Banker's telephone number, but Ruiz claimed that the police department did not have one. (ROA.8065.)

Another booking officers let Ramirez telephone his friend, Jerry Garcia. (ROA.8065.) Ramirez asked Garcia to tell his mother that he had been arrested and to contact Charles Banker. (ROA.8065.)

After Ramirez got off the phone, Ruiz and another detective, Edgar Ruiz, took Ramirez into an office and began interrogating him. (ROA.8065–ROA.8066.) The detectives told Ramirez that they knew everything that happened and claimed others had named him as the shooter. (ROA.8066.) They questioned Ramirez for 30-40 minutes and played him a portion of Robert Garza's statement. (ROA.8066–ROA.8067.) Afterwards, the detectives said: "Why don't you just go ahead and save yourself. You are the only stupid one getting sent to death row because everybody

is pointing the finger at you." (ROA.8067.)

At first, Ramirez denied any involvement, but after being repeatedly denied contact with a lawyer, Ramirez told officers that he was present at scene on the night of the offense. (ROA.8067.) Only then did officers read Ramirez his rights. (ROA.8067.) Having already implicated himself, Ramirez signed the rights waiver form as instructed. (ROA.8067–ROA.8068.) Ramirez then gave the recorded statement that ultimately became the primary evidence used against him at trial. (ROA.8068.)

Ramiro Ruiz began Ramirez's recorded statement by stating, "In reference to the night in question, do you want to go ahead and start and tell us from when you received the phone call and who you received the phone call from." (ROA.7981; ROA.9570.) Ramirez told the detectives that around 7:00 or 8:00 p.m., he received a phone call from Robert Garza asking if he wanted to make some money by stealing 1,000 pounds of marijuana. (ROA.7981.) When Garza and Ramirez arrived at their friend Juan Cordova's house, other individuals were already there, some of whom Ramirez did not know. (ROA.7981.) Ramirez reported that everyone was wearing black for the most part and that some were wearing ski masks. (ROA.7983.) The group took two vehicles to the property on Monte Cristo Road and then approached the houses from the back. (ROA.7983.) When someone came outside, they rushed both houses. (ROA.7983.)

Ramirez, Solis, and a third individual whose name Ramirez did not know found Rosie Gutierrez and Jerry Hidalgo in the house on the west side of the property. (ROA.7981.) Ramirez said they held Hidalgo at gunpoint and he told someone to tie up Gutierrez. (ROA.7981.) He checked to see if anyone else was in the house and looked for drugs and weapons. (ROA.7981.) Not finding anything, he tied up Hidalgo with an extension cord and demanded drugs. (ROA.7981.) When Hidalgo did not cooperate, he hit him with a frying pan. (ROA.7981.) After hearing gunshots coming from the other house, they went outside to see what was happening. (ROA.7981.) They saw the others running out of the house on the east side of the property, shouting "Let's go. Let's go." (ROA.7981–ROA.7982.) Ramirez, Solis, and the third individual started running from the property, hearing more gunshots as they ran. (ROA.7982.)

When asked who provided the guns, Ramirez explained that everything was set up when he arrived at Cordova's residence. (ROA.7982.) He did not know who was in charge but guessed it was the owner of the Escalade they used as transportation. (ROA.7982.) Ramirez explained that he did not know everyone involved, telling the officers, "like I said earlier, I wasn't in all my five senses, so I – I wasn't really concerned about who was there." (ROA.7982.) He denied seeing anyone shooting, stating, "Nobody in the house that I was with shot no one." (ROA.7982.) Ramirez told the officers that afterwards they went back to Cordova's

house where Robert Garza told the others, "I shot the mother fuckers," and they argued about the fact that no drugs were found. (ROA.7983, ROA.7984.) Ramirez admitted that he took a gold chain from Hidalgo, which he later threw away. (ROA.7984.) He did not know what happened to the weapons but told detectives that he burned his gloves the next day. (ROA.7983.) The officers did not ask Ramirez if he ever went by the name Lenny.

### 2. The Suppression Hearing

Incompatible versions of Ramirez's interrogation were introduced at the pretrial suppression hearing, conducted over the course of two days. (ROA.7729–ROA.8050; ROA.8051–ROA.8133 *passim*.) The primary dispute at the hearing was between Ramirez and Officer Edgar Ruiz and their respective versions of what occurred prior to Ramirez's statement being recorded.

The State presented two witnesses, Edinburg Police Officers Edgar Ruiz ("E. Ruiz"), and Daniel Ochoa. According to E. Ruiz, he read Ramirez his *Miranda* warnings prior to questioning him and then obtained a recorded statement thereafter. (ROA.7977.) He testified that he read Ramirez his *Miranda* warnings at 3:27 p.m. and that Ramirez acknowledged and signed the waiver form at 3:29 p.m. (ROA.7977–ROA.7978; ROA.10246.) There is a gap of 50 minutes between the waiver and the commencement of the audio recording at 4:20 p.m. (ROA.10660; ROA.10664, ROA.10672.) E. Ruiz destroyed his notes of the unrecorded portion of

the interrogation. (ROA.7989–ROA.7990.) He testified that after he explained to Ramirez what information the police had already collected from other co-defendants, Ramirez decided to cooperate. (ROA.7978.)

E. Ruiz also claimed that Ramirez provided new information that the police did not previously have—that one of the victims was hit on the head with a frying pan. (ROA.7979.) Defense counsel attempted to impeach him with the statement of surviving victim Rosie Guiterrez, which had been taken about three weeks prior to Ramirez's arrest. (ROA.7993–ROA.7994.) However, Gutierrez told police only that Hidalgo had been hit with something and that she was not sure what it was. (ROA.7994.) It was actually Bocanegra who provided the critical information about the frying pan that could have been used to impeach E. Ruiz. (ROA.17555–ROA.17556.)

The defense called Officers Ramiro Ruiz ("R. Ruiz") and Alberto Alvarez, Ramirez's mother Juana, and Marita Morales, a neighbor who witnessed Ramirez's arrest. (ROA.8004–ROA.8028; ROA.8055–ROA.8061.) R. Ruiz denied talking to either E. Ruiz or Ramirez before starting Ramirez's recorded statement but acknowledged that he began by asking, "In reference to the night in question, do you want to go ahead and start and tell us from when you received the phone call and who you received the phone call from." (ROA.8020–ROA.8022.) At the suppression hearing, R. Ruiz was not sure how he knew, prior to speaking with Ramirez, that

Ramirez had received a phone call before the offense. (ROA.8020–ROA.8022.) However, he later insisted that he asked Ramirez to start at that point because he had previously received information that all the participants were summoned with a phone call: “At that point, I had already talked or—my investigation had already told me that this meeting between these people was done by phone calls.” (ROA.9570–ROA.9571.)

The defense also called Ramirez, who testified that he told officers that he was under the influence of Rohypnol prior to giving his statement. (ROA.8089.) Ramirez testified that he unambiguously informed the officers that he did not want to speak to them and that he wanted a lawyer. (ROA.8064.) He confirmed that when officers brought him into E. Ruiz’s office for questioning, they did not inform him of his rights prior to their interrogation. (ROA.8066, ROA.8085.) Ramirez testified that he had not been read his rights until just prior to his statement being recorded, after he had already been interrogated for approximately 30-40 minutes. (ROA.8066–ROA.8067.) Ramirez stated that he believed that the officers would not relent until he gave them a statement. (ROA.8069.) Finally, and critically, Ramirez testified that during the unrecorded portion of the interrogation the detectives told him what to say. (ROA.8075.)

Following the presentation of this evidence, the trial court denied the motion to suppress the confession and Ramirez’s statements were used against him at trial.

### 3. New Evidence

The new evidence Ramirez proffered in support of this claim falls into two categories that further support his actual innocence and the involuntariness of his confession: 1) Bocanegra's post-trial sworn statements, and 2) updated mental-health findings that Ramirez is particularly vulnerable to giving a false confession.

First, if there is any truth to Ramirez's confession, he must have been the person whom Bocanegra identified as Lenny. The inverse must also be true: if Lenny's actions were in fact committed by someone else, then Ramirez gave a false confession. Since trial, Bocanegra has now acknowledged that Ramirez was not Lenny and that instead, he (Bocanegra) is the person described as "Lenny," and "the actions that [he, Bocanegra] attributed to Lenny," were actually committed by him. (ROA.2063.)

Second, an updated analysis from false-confession expert Dr. Deborah Davis, who submitted a 2013 report during state-habeas proceedings (ROA.18971), concludes that "[t]he records in this case clearly show that Mr. Ramirez suffered greatly enhanced vulnerability to suggestion, interrogative influence, and false confession." (ROA.3609.) Excerpts from her updated findings include that: 1) "[A]lthough [Ramirez] was born with brain damage, this was accelerated by his postnatal adversities; making his functional age and abilities far below those implied by his biological age." (ROA.3599); 2) "Features of the childhood of Mr. Ramirez

have been clearly associated with the [] four bases of vulnerability [to false confessions].” (ROA.3601); 3) “[T]he degree of [Ramirez’s] impairment is much greater than previously documented.” (ROA.3603); 4) “It is more than clear that Mr. Ramirez’s intellectual functioning and impairments in executive and neuropsychological functioning would place him at significant risk in police interrogation.” (ROA.3604); 5) “[E]ven in the absence of a learning disability, life histories such as that of Mr. Ramirez have been shown to be predictive specifically of false confession[.]” (ROA.3611); and 6) “[T]he existing impairments afflicting Mr. Ramirez were exacerbated by his condition during interrogation.” (ROA.3611.)

Dr. Davis also relied on findings from Dr. Bigler, a neuropsychologist, who “reviewed MRI evidence of abnormalities in the structures and functioning of Ramirez’s brain, as well as evidence from neuropsychological testing and neurological exam.” (ROA.3601 (cleaned up).) Dr. Bigler concluded that the “normal disadvantages in adolescent brain function were exponentially magnified due to [Ramirez’s] preexisting brain damage . . . [T]he objective and valid assessments of his brain function reveal areas of cognitive and emotional functioning that are typical of an 8 or 9 year old, not someone who was 18.” (ROA.3599 (quoting ROA.2115 (report of Dr. Erin D. Bigler, Ph.D.).)

Bocanegra’s recent admissions and Dr. Davis’s recent findings, taken alone, cast serious doubt on the reliability of Ramirez’s purported confession. Taken

together, they show a clear incompatibility between Bocanegra's and Ramirez's statements and provide scientific reasons to discredit Ramirez's purported confession rather than Bocanegra's inculpatory statements. In addition, they provide ample support for reasonable jurists to disagree with the district court's resolution of this claim and this Court should grant Ramirez a COA so that it can consider the merits of his claim, including his request for an evidentiary hearing based on this threshold showing.

The magistrate judge found Bocanegra's statements unreliable because the three statements he gave "vary[] widely in several crucial details." (ROA.3417.)[10] But there is no "wide" variation among Bocanegra's statements—the *only* variation between his statements is whether he is Lenny. In his first statement, Bocanegra inculpated himself and an individual named Lenny. (ROA.17556–ROA.17557.) In his second statement, Bocanegra clarified that Ramirez is not Lenny. (ROA.19058.) In his final statement, Bocanegra confessed that he (Bocanegra) is Lenny. (ROA.2063.) At no point did Bocanegra identify Ramirez as Lenny or identify him as involved in the crime, for that matter. In any event, even a witness recantation does not render the recantation unreliable. The credibility assessments of

[10] The magistrate judge discussed Bocanegra's credibility in the context of Claim Three of Ramirez's Amended Petition, which argued that any default of that claim is excused by the fundamental-miscarriage exception based on actual innocence. (*See* ROA.3414.) Accordingly, the analysis of Bocanegra's credibility with respect to the declarations is applicable to this claim. (ROA.3414–ROA.3418.)

Bocanegra's post-trial statements against Ramirez's statements should be subject to adversarial testing under oath and before a factfinder. *See, e.g.*, *Arnold v. Dittmann*, 901 F.3d 830, 840 (7th Cir. 2018). Case law makes clear that recantations warrant adversarial testing to weigh reliability against earlier statements. *See Coleman v. Hardy*, 628 F.3d 314, 320–21 (7th Cir. 2010), *as amended on denial of reh'g and reh'g en banc* (Feb. 7, 2011) (remanding for an evidentiary hearing to "evaluate the reliability" of the recantation of a codefendant whose "reputation for honesty is weak"); *Teleguz v. Pearson*, 689 F.3d 322, 326–27, 330–31 (4th Cir. 2012); *Ex parte Smith*, No. WR-73,266-01, 2010 WL 975230, at *1 (Tex. Crim. App. Mar. 17, 2010); *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002). And while Bocanegra's subsequent statement clarifying that he committed the acts he originally attributed to Lenny is not identical to a full recantation, it offers a change to his version of the events by taking responsibility for more serious aspects of the crime than in his original confession and equally warrants adversarial testing under oath in an evidentiary hearing. Similarly, the testimony of Dr. Davis is new, reliable evidence (as is the testimony of the medical and neuropsychological experts she relied upon to draw her conclusions with respect to the conditions rendering Ramirez vulnerable to false confession) that "may indeed call into question" the credibility of witnesses presented at trial." *Schlup*, 513 U.S. at 330–32.

When faced with the request for a hearing, a court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial. . . . The fact-intensive nature of the inquiry, together with the [lower] court's ability to take testimony from the few key witnesses[,]" weighs in favor of, at minimum, a hearing to determine the reliability of the new evidence. *Id.*at 332, 328 ("The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." (quotation omitted)).

Here, the district court failed to hold the requested hearing and refused to consider the new evidence that renders Claim 4(H) unexhausted but meritorious through the *Schlup* gateway. Reasonable jurists could disagree with the district court's decision to deny Ramirez an evidentiary hearing, and a COA should be granted on this claim. Even if this Court believes that "every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail" on this claim, the Court must still issue a COA if a reasonable jurist "would find the district court's assessment of [this] constitutional claim[] debatable or wrong." *Skinner*, 528 F.3d at 340-41 (quoting *Miller-El*, 537 U.S. at 336, 338). Ramirez has made that threshold showing here.

## CONCLUSION

Ramirez's trial and sentencing proceedings involved serious and prejudicial violations of Ramirez's constitutional rights. The question before this Court is not whether Ramirez will prevail on either claim, but rather whether, after conducting a "threshold inquiry," it concludes that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Skinner*, 528 F.3d at 340-41 (quoting *Miller-El*, 537 U.S. at 336, 338). Because reasonable jurists could debate the district court's decisions as to both Claim 1 and Claim 4(H), Ramirez respectfully requests that this Court issue a COA as to both claims and order briefing and argument on the merits of each claim.

Respectfully submitted this 7th day of October, 2025.

JON M. SANDS
FEDERAL PUBLIC DEFENDER
District of Arizona

JENNIFER Y. GARCIA (AZ NO. 021782)
*Counsel of Record*
SONIA L. FLEURY (CA NO. 298534)
ASSISTANT FEDERAL PUBLIC DEFENDERS
250 North 7th Avenue, Suite 600
Phoenix, Arizona 85007
(602) 382-2816 voice
(602) 382-2800 facsimile
Jennifer_Garcia@fd.org
Sonia_Fleury@fd.org
*s/ Jennifer Y. Garcia*
JENNIFER Y. GARCIA
ASSISTANT FEDERAL PUBLIC DEFENDER

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit and the word limit of Fed. R. App. P. 32(a)(7)(B). Excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,882 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32 (a)(7)(B)(i) and Fed. R. App. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Times New Roman font.

*s/ Jennifer Y. Garcia*
JENNIFER Y. GARCIA
ASSISTANT FEDERAL PUBLIC DEFENDER

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I electronically filed the foregoing to the Clerk's Office by Using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Daniel Juarez*
ASSISTANT PARALEGAL